UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


PETER McNEIL,

                Plaintiff,                                    Hon. Wendell A. Miles

v.                                                   Case No. 5:06-CV-111

COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.

_____/


## REPORT AND RECOMMENDATION

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim

for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  Section 405(g)

limits the Court to a review of the administrative record, and provides that if the Commissioner's

decision is supported by substantial evidence, it shall be conclusive.

        The Commissioner determined that Plaintiff is not disabled as defined by the Act.

Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit

proposed findings of fact and recommendations for disposition of social security appeals, the

undersigned recommends that the Commissioner's decision be **reversed and this matter remanded**

**for the awarding of benefits**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

2

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 40 years of age at the time of the ALJ's decision. (Tr. 16). He completed two years of college and worked previously as a service manager, shop foreman, and mechanic. (Tr. 77, 82, 92-100).

Plaintiff applied for benefits on November 29, 2002, alleging that he had been disabled since September 4, 2000, due to headaches, neck pain, and knee pain. (Tr. 56-58, 76). Plaintiff's application was denied, after which time he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 33-54). On January 6, 2005, Plaintiff appeared before ALJ Thomas English, with testimony being offered by Plaintiff, Plaintiff's father, and vocational expert, Donald Hecker. (Tr. 776-826). A supplemental hearing was conducted on August 9, 2005, at which Dr. David Greenbaum testified. (Tr. 827-39). In a written decision dated October 27, 2005, the ALJ determined that Plaintiff was not disabled. (Tr. 15-28). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 8-11). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## **MEDICAL HISTORY**

In approximately 1983, Plaintiff suffered compression fractures at C5-7 for which he twice underwent cervical fusion surgery.  (Tr. 258, 296, 407, 557, 563, 586).

On November 8, 1999, Plaintiff reported to the emergency room complaining of a severe headache.  (Tr. 142-43).  Plaintiff described his headache as "extremely typical" and "exactly like his similar headaches."  (Tr. 142).  The results of a physical examination were unremarkable.  (Tr. 142-43).  Plaintiff was diagnosed with migraine cephalgia and treated with Dilaudid and Vistaril.  (Tr. 143).  After "a period of time" Plaintiff's condition stabilized and he was released.  *Id.*

On June 14, 2000, Plaintiff was examined by Dr. Richard Ferro.  (Tr. 149-50).  Plaintiff reported that he was experiencing head and neck pain.  (Tr. 149).  The doctor noted that Plaintiff was presently being treated with an occipital peripheral nerve stimulator which Plaintiff reported had been "working well" until recently when he began to experience "breakthrough" pain.  *Id.*  Plaintiff was given Dilaudid to treat his present symptoms and was also prescribed OxyContin and OxyIR to treat future "acute flares" of pain.  (Tr. 149-52).

Between July 18, 2000, and November 22, 2000, Plaintiff reported to the emergency room on six occasions complaining of severe headaches which were not relieved by his present medication regimen.  (Tr. 153-88).  Plaintiff also reported that he was occasionally experiencing photophobia and blurry vision.  During these visits Plaintiff was treated with Dilaudid, as well as Vistaril, Zofran, and Lomotil.  *Id.*

On December 2, 2000, Plaintiff reported to the emergency room complaining of severe headaches.  (Tr. 189-245).  Plaintiff was hospitalized to receive treatment and was discharged on December 4, 2000.  *Id.*

4

On December 20, 2000, and again on December 31, 2000, Plaintiff reported to the emergency room complaining of severe migraine headaches which were not sufficiently controlled by his present medication regimen.  (Tr. 246-54).  Plaintiff also reported experiencing photophobia, nausea, and blurry vision.  Plaintiff was treated with Dilaudid, Vistaril, and Phenergan.  *Id.*

On January 13, 2001, Plaintiff reported to the hospital complaining of "constant" headaches which he rated as 10 on a scale of 1-10.  (Tr. 257).  Plaintiff was admitted to the hospital for treatment.  (Tr. 255).  The results of a physical examination were unremarkable.  (Tr. 256-59).  Plaintiff participated in an electroencephalography examination, the results of which were "within normal limits."  (Tr. 276).  A CT scan of Plaintiff's head revealed "no abnormalities."  (Tr. 277).  The results of a mental status examination revealed that Plaintiff was suffering from major depressive disorder, severe, without psychotic features.  (Tr. 256).  Plaintiff's GAF score was rated as 40-45.[1]  *Id.*  Plaintiff was diagnosed with "intractable headache" and discharged on January 21, 2001.  (Tr. 277).

Plaintiff was readmitted to the hospital on January 23, 2001.  (Tr. 334-35).  Doctors modified Plaintiff's medication regimen and attempted (with some success) to treat Plaintiff's pain with physical therapy.  Plaintiff's care providers could not discern the precise cause for Plaintiff's headaches, but determined that "he does definitely have a muscle tension component, as well as a likely vascular component."  Plaintiff was discharged from the hospital on February 8, 2001.  *Id.*

---

[1]  The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV).  A score of 40 indicates that the individual is experiencing "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." DSM-IV at 34.  A score of 45 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning."  *Id.*

5

On February 20, 2001, Plaintiff returned to the hospital reporting that he was experiencing headaches which he rated as 8-9 on a scale of 1-10.  (Tr. 371-72).  Plaintiff was readmitted to the hospital for further treatment.  He was discharged on February 25, 2001.  *Id.*

On February 26, 2001, Plaintiff was examined by Dr. Joel Saper, Director of the Michigan Head Pain and Neurological Institute.  (Tr. 422-24).  Plaintiff reported that starting about two years ago he began experiencing headaches on a daily basis.  (Tr. 422).  Plaintiff described his headaches as causing "intense pain tending to worsen as the day goes on, somewhat relieved by opioid medications but not sufficient to return to work."  *Id.*  Plaintiff reported that his headaches were accompanied by nausea, dizziness, and sensitivity to sound and light.  (Tr. 423).  An examination revealed limited range of cervical motion, but was otherwise unremarkable.  The doctor concluded that Plaintiff was "experiencing daily cervicalgia and head pain with migraine features associated with increasing tolerance to opioid medication, likely leading to some rebound headache effect."  Dr. Saper recommended that Plaintiff participate in an in-patient "narcotic detoxification" during which his opiate medications would be replaced with non-narcotic medications.  The doctor informed Plaintiff that this "will be an unpredictably difficult process."  Nonetheless, Plaintiff was "willing to go into the hospital to undertake it."  *Id.*

Plaintiff was hospitalized two days later to begin participating in the "narcotic detoxification" program.  (Tr. 384-86).  Plaintiff experienced increased pain at the outset of treatment, but by March 20, 2001, the severity of his headaches had decreased to 1 on a scale of 1-5.  (Tr. 385).  The results of a psychological examination revealed that Plaintiff was suffering from (1) major depression, recurrent, severe; (2) opioid dependence; (3) nicotine dependence; (4) pain disorder associated with psychological factors and a general medical condition; (5) personality

6

disorder, NOS, with histrionic features; and (6) marital dysfunction, divorce and custody issues. (Tr. 391). Plaintiff was discharged from the hospital on March 22, 2001, at which point he "was significantly improved from preadmission status and off all opiate medications." *Id.* On discharge, Plaintiff was diagnosed with (1) migraine variant complicated by analgesic overuse; (2) cervicalgia; and (3) cervical post-laminectomy syndrome. (Tr. 386).

On May 8, 2001, Plaintiff reported to the hospital complaining that he had been experiencing a severe headache for 10 days. (Tr. 392). Plaintiff was given Dilaudid with "minimal success." Plaintiff was then admitted to the hospital for treatment where he remained until May 16, 2001. (Tr. 392-94).

On June 28, 2001, Plaintiff was examined by Dr. Saper. (Tr. 417). Plaintiff reported that his headaches were "significantly improved." Specifically, Plaintiff reported that he was experiencing "mild to moderate" headaches 1-2 days weekly and "severe" headaches 2-4 times monthly. Plaintiff indicated that he was "looking for a job." *Id.*

On July 28, 2001, Plaintiff reported to the emergency room complaining of a worsening headache. (Tr. 441-42). Plaintiff was diagnosed with an "acute exacerbation of chronic cephalgia." Plaintiff was given several medications and later released. *Id.*

On July 30, 2001, Plaintiff was examined by Alvin Lake III, Ph.D. at the Michigan Head Pain and Neurological Institute. (Tr. 407-11). Plaintiff reported that in the past two weeks he had experienced "four days of headache rated as 5 on a 5-point scale (incapacitating)." (Tr. 407).

On August 20, 2001, Plaintiff reported to Dr. Lake that he had experienced "four to five very difficult headaches in the last two weeks." (Tr. 415-16). Plaintiff also reported that he had recently begun working as a part-time "gopher" for his brother, a homebuilder. (Tr. 416, 792-93).

On September 10, 2001, Plaintiff was examined by Dr. Lake.  (Tr. 414).  Plaintiff reported that during the past two weeks he had experienced three severe headaches.  He further indicated that he was working approximately 40 hours weekly painting houses.  *Id.*

On September 29, 2001, Plaintiff participated in an MRI examination of his cervical spine, the results of which revealed "mild kyphotic angulation" at C5-6, but otherwise revealed no evidence of disc herniation, spinal stenosis, or foraminal narrowing.  (Tr. 425-26).

On October 2, 2001, Plaintiff participated in an EMG and nerve conduction study of his upper and lower extremities, the results of which revealed "mild" polyphasia, but no evidence of radiculopathy, mononeuropathy, or plexopathy.  (Tr. 427).

On May 5, 2002, Plaintiff reported to the emergency room complaining of a headache which he rated as 10 on a scale of 1-10.  (Tr. 474-76).  Plaintiff reported that he had been suffering from this headache for 24 hours without relief from his current medication regimen.  Plaintiff was admitted to the hospital for treatment and was discharged three days later.  *Id.*

Between May 25, 2002, and August 11, 2002, Plaintiff reported to the emergency room on five occasions complaining of severe headaches which were not relieved by his current medications.  (Tr. 482-524).  Plaintiff was diagnosed with "intractable" migraine headaches for which he given Dilaudid.  *Id.*

Plaintiff was again hospitalized on October 17, 2002 to treat his migraine headaches. (Tr. 563-64, 586-88).  Plaintiff was initially treated with "basic oral pain medications," after which he was given Dilaudid which provided him with pain relief.  (Tr. 587).  Plaintiff was discharged from the hospital on October 22, 2002.  (Tr. 586).

8

On three occasions between December 1, 2002, and December 11, 2002, Plaintiff received hospital treatment for his migraine headaches because his current medication regimen was ineffective in treating such. (Tr. 611-27). On December 14, 2002, Plaintiff returned to the hospital complaining of headache pain which he rated as 10 on a scale of 1-10. (Tr. 648). Plaintiff was admitted to the hospital where he received treatment until December 28, 2002. (Tr. 628-50).

Plaintiff was admitted to the hospital for treatment of his migraine headaches on the following dates: (1) June 16, 2003 to June 22, 2003; (2) July 12, 2003 to July 16, 2003; (3) December 13, 2003 to December 19, 2003; (4) April 11, 2004 to April 15, 2004; and (5) August 5, 2004 to August 11, 2004. (Tr. 703-17).

On March 7, 2005, Dr. David Greenbaum authored an email to the ALJ regarding Plaintiff's impairments. (Tr. 762). The doctor reported that Plaintiff's "primary problem appears to be a chronic pain syndrome secondary to recurrent headaches and neck pain that have been variously characterized as having migraine and/or cluster features." Dr. Greenbaum concluded, however, that Plaintiff's condition did not satisfy any of the impairments identified in the Listing of Impairments. *Id.*

On May 27, 2005, Dr. John Siano provided a sworn statement regarding Plaintiff's condition. (Tr. 123-37). The doctor reported that he had treated Plaintiff since 2002. (Tr. 126). The doctor testified that Plaintiff has "never" exhibited drug seeking behavior. (Tr. 127-28).

Dr. Siano reported that he prescribed for Plaintiff "high doses" of Zanaflex, a "potent muscle relaxer." (Tr. 129). The doctor noted that he had prescribed the highest doses possible of Ultracet and Neurontin. *Id.* According to Dr. Siano, Plaintiff still experiences "severe pain" and requires narcotic pain medication just "to be able to tolerate the pain enough to carry out some of his

9

activities of daily living like bathing, you know, getting dressed, taking care of some things in the house, things like that." (Tr. 130). The doctor reported that Plaintiff has experienced sleep difficulties related to his medication regimen. *Id.* Dr. Siano reported that occasionally Plaintiff "is almost completely incapacitated by the pain." (Tr. 131). In such circumstances, Plaintiff requires "unbelievably high doses of Dilaudid IV to get him out of pain and then he'll be able to move and start talking to you and start to function, which is hard to believe at the doses that he is taking that somebody would be functional, but he is awake and talking." *Id.*

Dr. Siano reported that the bone structure in Plaintiff's cervical spine is "very abnormal" causing him to experience "extremely limited" range of motion. (Tr. 134). The doctor noted that Plaintiff suffers "extreme spasm" of the muscles in his cervical spine during which time he "can barely move his head." *Id.* Dr. Siano observed that these spasms cause Plaintiff to experience "uncontrolled neck and head pain." (Tr. 135).

On August 16, 2005, Plaintiff participated in a consultive examination conducted by Dr. John Flood. (Tr. 770-73). Plaintiff reported that he was experiencing constant neck pain which ranged from 3-10 on a scale of 1-10. (Tr. 771). Plaintiff was observed to hold his head in a forward flexed position and an examination of his cervical spine revealed tenderness to palpation and spasm. *Id.* Plaintiff exhibited limited and painful range of cervical motion. (Tr. 772). Dr. Flood diagnosed Plaintiff with (1) status post anterior and posterior cervical fusion for fracture with instability; (2) progressive cervical degenerative disc disease; (3) greater occipital neuralgia; and (4) chronic neck pain. The doctor further noted that Plaintiff "has what appears to be progressive degenerative disease in the cervical spine which would be consistent with a multi-level fusion."

10

The doctor characterized Plaintiff's prognosis as "poor" and further concluded that "[b]ased upon his complaints of pain and the findings on his radiograph, as well as the fact that he requires Duragesic pain medication for pain control, in addition to his other medications, I do not believe that he could be gainfully employed at this time.  It is likely that he will have progression of his cervical degenerative disease over time and there are no good surgical options for this."  *Id.*

At the initial administrative hearing, Plaintiff testified that he suffers "some form of headache every day."  (Tr. 794).  He reported that his headaches range in severity from 3/4 to 10 on a scale of 1-10.  *Id.*  As for how often he experiences "a 10 type" headache, Plaintiff testified that he experienced "four or five" every month that "totally cripple me."  (Tr. 794-95).  Plaintiff reported that these particular headaches "sometimes" last "a couple of days" and render him incapable of doing "anything."  (Tr. 803).

With respect to his activity level, Plaintiff testified that his father helps him "quite a bit" with his housework.  (Tr. 799).  Plaintiff reported that he does "some" cooking, but cannot wash his laundry.  *Id.*  He testified that he likes to draw and paint, but can only do so for limited periods of time.  (Tr. 800).  Plaintiff testified that on a typical day he watches television and reads magazines.  *Id.*

At the supplemental administrative hearing, Dr. Greenbaum testified that Plaintiff did not exhibited the characteristics of a drug addict and, moreover, that his medication regimen was "appropriate."  (Tr. 831-32).  Dr. Greenbaum further added that an individual can be rendered incapable of performing work activities as a result of severe headache pain.  (Tr. 833-35).

11

## ANALYSIS OF THE ALJ'S DECISION

### A.  Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating

disability.  *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[2]  If the Commissioner can make a

dispositive finding at any point in the review, no further finding is required.  *See* 20 C.F.R. §§

404.1420(a), 416.920(a).  The regulations also provide that if a claimant suffers from a nonexertional

impairment as well as an exertional impairment, both are considered in determining her residual

functional capacity.  *See* 20 C.F.R. §§ 404.1545, 416.945.

### B.  The ALJ's Decision

The ALJ determined that Plaintiff suffers from the following severe impairments: (1)

headaches secondary to neck pain; (2) status post anterior and posterior cervical fusion; (3)

degenerative disc disease of the cervical spine; (4) narcotic dependence; (5) pain disorder; and (6)

depression. (Tr. 22).  The ALJ further determined that these impairments, whether considered alone

or in combination, fail to satisfy the requirements of any impairment identified in the Listing of

---

[2] 1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2.  An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4.  If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5.  If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  *Id.*  The ALJ concluded that while Plaintiff was unable to perform his past relevant work, there existed a significant number of jobs which he could perform despite his limitations.  (Tr. 22-26).  Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### 1.  The ALJ's Decision is Not Supported by Substantial Evidence

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy.  *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure.  While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform light work provided he not engage in prolonged or repetitive rotation, flexion, or hyperextension of the neck.  (Tr. 25).  With respect to Plaintiff's mental impairments the ALJ determined that Plaintiff experiences mild restrictions in the activities of daily living, mild difficulty maintaining social functioning, moderate difficulty maintaining

13

concentration, persistence or pace, and has never experienced an episode of decompensation. (Tr. 24). Accordingly, the ALJ further concluded that Plaintiff can exhibit only limited concentration and can only perform jobs with 1, 2, or 3 step instructions. (Tr. 25).

The ALJ determined that Plaintiff was unable to perform his past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, his limitations notwithstanding. *See Richardson*, 735 F.2d at 964.

While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, her limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Donald Hecker.

The vocational expert testified that there existed approximately 38,000 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 810-12). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (a finding that 2,500 jobs existed which the claimant could perform constituted a significant number); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988) (the existence

14

of 1,800 jobs which the claimant could perform satisfied the significance threshold).  Accordingly, the ALJ concluded that Plaintiff was not disabled.

> a. The ALJ's determination regarding Plaintiff's RFC is not supported by substantial evidence

A claimant's RFC represents his ability to perform "work-related physical and mental activities in a work setting on a regular and continuing basis," defined as "8 hours a day, for 5 days a week, or an equivalent work schedule."  Social Security Ruling 96-8P, 1996 WL 374184 at *1 (Social Security Administration, July 2, 1996); *see also*, *Shaw v. Apfel*, 220 F.3d 937, 939 (8th Cir. 2000) (same); *Lanclos v. Apfel*, 2000 WL at *3, n.3 (9th Cir., July 31, 2000) (same); *Moore v. Sullivan*, 895 F.2d 1065, 1069 (5th Cir. 1990) (to properly conclude that a claimant is capable of performing work requires "a determination that the claimant can *hold* whatever job he finds for a significant period of time").

The record clearly establishes that Plaintiff suffers from severe headaches which have required numerous hospitalizations and treatment with various narcotic medications.  Plaintiff has twice endured spinal fusion surgery which according to Dr. Siano, Plaintiff's treating physician, has left his cervical spine in a "very abnormal" condition.  The doctor reported that Plaintiff's cervical condition causes him to experience "uncontrolled" headaches which produce "severe pain."  Dr. Siano reported that Plaintiff's headache pain renders him "almost completely incapacitated" and necessitates that he consume "high doses" of narcotic pain medication which leave him capable of performing only very limited activities.  Dr. Flood, a consulting physician who examined Plaintiff, likewise concluded that Plaintiff suffered from "progressive degenerative disease" which was

15

consistent with "a multi-level [spinal] fusion."  Even Dr. Greenbaum, a physician with whom the ALJ consulted, concluded that Plaintiff suffered from chronic pain syndrome for which high doses of narcotic medication was "appropriate."  The doctor further observed that severe headache pain can render an individual disabled.  In sum, the medical evidence of record simply fails to support the ALJ's RFC determination.

The medical evidence establishes that Plaintiff suffers from impairments which can reasonably be expected to produce the pain and limitations from which he suffers.  *See Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997).  Nonetheless, the ALJ rejected Plaintiff's subjective allegations stating that such were inconsistent with the medical evidence and Plaintiff's reported activities.  The ALJ's conclusion in this regard is not supported by substantial evidence.

First, as discussed above, the medical evidence in this matter is consistent with Plaintiff's subjective allegations.  As for Plaintiff's reported activities, the Court fails to discern how such support the ALJ's decision.  Plaintiff has consistently reported that while he is generally capable of performing a limited range of activities, he regularly suffers severe headaches which render him completely incapable of performing even a limited range of activities.  Such is overwhelmingly confirmed by the medical evidence discussed above, including (but certainly not limited to) the numerous hospitalizations which Plaintiff has endured.

The ALJ observed no behavior contradicting Plaintiff's allegations, nor have any of Plaintiff's care providers called into question the veracity of Plaintiff's subjective allegations.  *See Felisky v. Bowen*, 35 F.3d 1027, 1040-41 (6th Cir. 1994) (substantial evidence did not exist to support the ALJ's decision to discredit the claimant's testimony where the claimant's testimony was

consistent with information provided to her physicians, none of whom expressed doubts regarding her symptoms or indicated that she exaggerated her pain). In fact, the ALJ himself characterized Plaintiff as "clearly debilitated." (Tr. 821). While the ALJ has arguably identified evidence supporting his position, Plaintiff is not required to establish the absence of any and all factors adverse to his position. *Id.* at 1041 (it is not necessary that every single factor favor the claimant before finding that the ALJ's decision is not supported by substantial evidence).

Two aspects of the ALJ's credibility determination warrant further discussion. First, the ALJ placed great reliance on Plaintiff's condition during a very short period in 2001. (Tr. 23). As detailed above, Plaintiff participated in a "narcotic detoxification" program in the spring of 2001, as there was concern that Plaintiff's narcotic medication was exacerbating his condition. Following this treatment, Plaintiff enjoyed a brief period of respite from the severe headaches he had been experiencing. Plaintiff's condition improved to the point that he was able to begin working for his brother *on a part-time basis* as a "gopher." Plaintiff was unable to perform this work for very long, however, as his condition very quickly deteriorated as the medical evidence discussed above details. The Court simply fails to discern how Plaintiff's failed work attempt (about which he voluntarily testified) detracts from his credibility.

The ALJ also appeared unduly fixated on his belief that Plaintiff was/is a narcotic abuser. (Tr. 24). The ALJ concluded that Plaintiff's alleged narcotic abuse detracted from his credibility. The record contains evidence that Plaintiff's care providers at one time *theorized* that Plaintiff's headaches may be exacerbated by the narcotic medication he was taking. While Plaintiff enjoyed a very brief respite from severe headaches following his 2001 "narcotic detoxification," his debilitating headaches very quickly returned, necessitating that he be *prescribed* narcotic medication.

17

Plaintiff's treating physician, Dr. Siano, reported that Plaintiff had "never" exhibited drug seeking behavior, a conclusion supported by the voluminous medical record.  Dr. Siano further reported that Plaintiff's medical condition *required* that he consume high dosages of narcotic medication, a conclusion supported by Dr. Greenbaum and Dr. Flood, consulting physicians who examined Plaintiff.

The ALJ's assertion that Plaintiff is a narcotic abuser suggests that Plaintiff either obtained the medication improperly or consumed such in a manner inconsistent with his physician's instructions.  The record contains no evidence of such.  While there may exist evidence suggesting that Plaintiff's use of narcotic medication has exacerbated his condition, such hardly equates with narcotic abuse where such medication is deemed medically necessary and consumed according to the prescribing physician's instructions.

In sum, the evidence reveals that Plaintiff is unable to perform work activity on a regular and continuing basis (i.e., 8 hours a day, 5 days a week).  While Plaintiff is certainly capable of sporadic and limited activities, such is not inconsistent with the finding that he is disabled.  *See Leos v. Comm'r of Soc. Sec.*, 1996 WL 659463 at *2 (6th Cir. 1996) (the fact that a claimant performed limited nonstrenuous activities does not preclude a finding that she experiences pain to a disabling degree); *Wright v. Sullivan*, 900 F.2d 675, 682 (3d Cir. 1990) ("sporadic or transitory activity does not disprove disability"); *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989) (to be found unable to engage in substantial gainful activity the claimant need not "vegetate in a dark room" or be a "total basket case").  Accordingly, for the reasons herein discussed, the Court concludes that the ALJ's RFC determination is not supported by substantial evidence.

18

As indicated above, the vocational expert testified that there existed a significant number of jobs which Plaintiff can perform consistent with his RFC.  However, the ALJ's RFC determination is not sufficiently supported by the evidence of record.  In short, therefore, the hypothetical question, the response to which the ALJ relied upon to support his decision, was based upon an improper RFC determination.  Accordingly, the ALJ's conclusion that there exists a significant number of jobs which Plaintiff can perform despite his limitations, is supported by less than substantial evidence.  *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996) (while the ALJ may rely upon responses to hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments).

### b.  Evidence of Plaintiff's disability is compelling

While the ALJ's decision is not supported by substantial evidence, Plaintiff can be awarded benefits only if proof of his disability is "compelling."  *Faucher v. Sec'y of Health and Human Services*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and immediately award benefits if all essential factual issues have been resolved and proof of disability is compelling).

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, may be severe enough to constitute disability."  *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984).  As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled."  20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th

Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)).  Instead, a claimant's assertions of disabling pain and

limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an
> underlying medical condition.  If there is, we then examine: (1)
> whether objective medical evidence confirms the severity of the
> alleged pain arising from the condition; or (2) whether the objectively
> established medical condition is of such a severity that it can
> reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted).  This standard is often referred to as the *Duncan*

standard.  *See Workman v. Commissioner of Social Security*, 2004 WL 1745782 at *6 (6th Cir., July

29, 2004).

Accordingly, "subjective complaints may support a finding of disability only where

objective medical evidence confirms the severity of the alleged symptoms."  *Id.* (citing *Blankenship

v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)).  As discussed above, the medical evidence reveals

that Plaintiff suffers from impairments which can reasonably be expected to impair him to the extent

alleged.  Moreover, the medical evidence is consistent with Plaintiff's subjective allegations.

Accordingly, for the reasons discussed herein, the Court concludes that the evidence of Plaintiff's

disability is compelling.

## <u>CONCLUSION</u>

For the reasons articulated herein, the undersigned concludes that the ALJ's decision does not conform to the proper legal standards and is not supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **reversed and this matter remanded for the awarding of benefits**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


Date:  July 5, 2007                                          /s/ Ellen S. Carmody_____
                                                            ELLEN S. CARMODY
                                                            United States Magistrate Judge